386 So.2d 788 (1980)
Ernest Charles DOWNS, Appellant,
v.
STATE of Florida, Appellee.
No. 53524.
Supreme Court of Florida.
May 22, 1980.
Rehearing Denied September 12, 1980.
*789 Richard Lovett Brown, Jacksonville, for appellant.
Jim Smith, Atty. Gen., and Raymond L. Marky, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Ernest Charles Downs was convicted of the murder in the first degree of Forrest Jerry Harris, Jr. The jury recommended that the death penalty be imposed, and, after weighing the aggravating and mitigating circumstances, the trial court imposed a sentence of death. Downs' conviction and sentence of death are before this Court on direct appeal pursuant to article V, section 3(b)(1), Florida Constitution. Downs also appeals his conviction for conspiracy to commit first-degree murder. We have reviewed the record, considered the fifteen points raised on appeal, and have found no reversible error.
In April, 1977, John Barfield approached Downs with an offer of five thousand dollars if Downs would kill Harris. Downs accepted the contract to kill Harris and enlisted the assistance of Larry Johnson. On April 23, 1977, at Downs' insistence, Johnson phoned Harris and identified himself as Joseph Green, from whom Harris was expecting a call, and told Harris that he wanted to talk to him about flying contraband. They arranged a meeting in Jacksonville. Downs drove down a dirt road and left Johnson there to await Downs' return with Harris. Downs picked up Harris *790 and drove to the location where he had left Johnson. Harris exited the car and approached Johnson at which time Downs shot Harris four times in the head with a .25 caliber automatic pistol. Together, Downs and Johnson dragged the body off the road into the bushes where Downs fired another shot into Harris' chest to make sure that he was dead.
Downs argues that his conviction should be reversed because the trial court erred in allowing into evidence a diagram prepared by Johnson outside the courtroom, because he was denied due process by the prosecutor's interruption of defense counsel during defense reply summation, because he was denied an impartial jury, because he was deprived of due process by not being allowed to videotape depositions, because his right to cross-examine a witness was curtailed, because he was deprived of his right to compulsory process for obtaining witnesses, because he was denied his fifth amendment right against self-incrimination, because he was denied due process by admission of a particular hypothetical question propounded by the prosecutor to the medical examiner, because the judge commented on the evidence, and because the evidence is insufficient to support the conviction.
For the most part, Downs' points on appeal are completely without merit and do not require explication; however, his allegation that he was denied an impartial jury under the sixth and fourteenth amendments and contrary to the dictates of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), does warrant discussion. Downs contends that it was improper to excuse five jurors for cause who indicated an inability to vote for the death penalty but an ability to determine guilt.
The Supreme Court, in Witherspoon, held that a sentence of death cannot be carried out if the jury that imposed or recommended the death penalty was chosen by excluding veniremen for cause who voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction but who did not state that they would automatically vote against the imposition of such punishment. At Witherspoon's trial, the prosecution eliminated almost half the prospective jurors because they expressed qualms about capital punishment. Only five out of the fortyseven jurors excused for cause in Witherspoon stated that under no circumstances would they vote to impose the death penalty. The Supreme Court explained:
If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply "neutral" with respect to penalty. But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the State crossed the line of neutrality. In its quest for a jury capable of imposing the death penalty, the State produced a jury uncommonly willing to condemn a man to die.
391 U.S. at 520-521, 88 S.Ct. at 1776. The Supreme Court did not disturb the conviction but only held that under the circumstances the death sentence would not be carried out.
Although in Witherspoon the Supreme Court was not directly confronted with the question presented by Downs  whether a juror, who states that he is able to determine guilt in an unbiased manner but would never vote for the death penalty, may be excused by the State for cause  it did say:
We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a per se constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.
391 U.S. at 517-518, 88 S.Ct. at 1774-1775. Furthermore, the Court noted:

*791 The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.
.....
We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or [emphasis supplied] (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. Nor does the decision in this case affect the validity of any sentence other than one of death. Nor, finally, does today's holding render invalid the conviction, as opposed to the sentence, in this or any other case.
391 U.S. at 523, n. 21, 88 S.Ct. at 1777, n. 21. See also Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).
In Witt v. State, 342 So.2d 497 (Fla. 1977), we applied Witherspoon and held that it is proper to exclude prospective jurors for cause who say that they could never vote to impose the death penalty.
The identical point presented by Downs was dealt with by the United States Court of Appeals, Fifth Circuit, in Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), cert. den., 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979). Therein, two veniremen, excluded for cause, stated that they would automatically vote against imposition of the death penalty but that they could fairly judge defendant's guilt or innocence. The Fifth Circuit found nothing constitutionally impermissible in the exclusion of these veniremen and reasoned:
But the state also enjoys the right to an impartial jury, Williams v. Wainwright, supra, 427 F.2d at 923, and impartiality requires not only freedom from jury bias against the accused and for the prosecution, but freedom from jury bias for the accused and against the prosecution ... Florida, however, has determined that even though a venireman states he can fairly judge guilt or innocence, if he also states that he is irrevocably committed before the trial has begun to vote against the penalty of death, regardless of the facts and circumstances that might emerge at trial, he must be excluded completely. The state has decided that the parties' right under the Sixth and Fourteenth Amendments to an impartial trial and the state's interest in the just and evenhanded application of its laws, including Florida's death penalty statute, are too fundamental to risk a defendant-prone jury from the inclusion of such veniremen. The Constitution does not prohibit this judgment... . The jury that emerges after excluding such veniremen, having been carefully examined to exclude also for cause those veniremen who are biased against the defendant, either as to guilt or as to punishment, is impartial. To call it prosecutionprone is to misunderstand the meaning of impartiality... .
578 F.2d at 596.
The jurors in the present case who were excluded stated that they could not, under any circumstances, vote to impose the death penalty after a verdict of guilty was returned. By stating that they were unwilling to consider all the penalties provided by law, they evidenced their inability to follow the law and were properly excluded by the trial court.
In addition to reviewing the record in light of the errors alleged by Downs, which we find to have no merit, we also have reviewed the record pursuant to Florida Rule of Appellate Procedure 9.140(f) to determine whether the interests of justice require a new trial and conclude that no *792 new trial is required. Although defense counsel diligently tried to find weak points in the State's case and to raise doubts as to the credibility of the State's witnesses, the evidence of Downs' guilt is overwhelming, and the jury could not have reasonably returned any other verdict. Downs received the full due process of the law and a fair trial free of any reversible error. Accordingly, we affirm the convictions.
We next consider Downs' challenges to the imposition of the death penalty. The trial court, in a detailed sentencing order, stated:
MITIGATING ELEMENTS
A. WHETHER DEFENDANT HAS NO SIGNIFICANT HISTORY OF PRIOR CRIMINAL ACTIVITY.

Finding: This mitigating element is absent since the evidence shows that the defendant does have a significant history of prior criminal activity. The defendant, at age 16, was charged with robbery and attempted robbery resulting in three (3) years parole. On May 15, 1965 the defendant was sentenced for parole violation on the count of robbery first degree to ten (10) to twenty-one (21) years and on the attempted robbery first degree to five (5) to ten and one-half (10 1/2) years. On February 14, 1968 the defendant in the United States District Court, Tulsa, Oklahoma, was sentenced to five (5) years for violation of the Dyer Act to be served consecutive to a state sentence of interstate transportation of stolen vehicle. On October 28, 1969 the defendant was sentenced to three (3) years in the Kansas State Industrial Reformatory on a charge of escape. The defendant was arrested December 23, 1976 on a worthless check charge and two (2) charges of failure to appear resulting in fines.
The defendant currently has two (2) pending felony charges of uttering a forged instrument and worthless checks.
B. WHETHER THE MURDER WAS COMMITTED WHILE THE DEFENDANT WAS UNDER THE INFLUENCE OF EXTREME MENTAL OR EMOTIONAL DISTURBANCE.

Finding: This mitigating element is not present. There is no evidence at all tending to show that the defendant was under the influence of an extreme mental or emotional disturbance. The report shows the defendant to be of above average intelligence, no use of intoxicating beverages or drugs and no indication of a mental or emotional disturbance.
C. WHETHER THE VICTIM WAS A PARTICIPANT IN THE DEFENDANT'S CONDUCT OR CONSENTED TO THE ACT.

Finding: This mitigating element is not present. There was evidence tending to show that the victim was contacted on a ruse that the victim's services in flying illegal contraband or drugs for a payment of money was the reason that the victim was in the company of the defendant and Larry Johnson at the time of his death. The Court does not find this evidence to be conclusive, but accepting it for the purpose of determining the presence of this mitigating element, the Court would find that such conduct did not make the victim a participant in his own murder nor show any consent by the victim to the murder.
D. WHETHER THE DEFENDANT WAS AN ACCOMPLICE IN THE MURDER COMMITTED BY ANOTHER PERSON AND HIS PARTICIPATION WAS RELATIVELY MINOR.

Finding: The mitigating element is not present. Testimony presented at trial shows that the defendant took the victim to an isolated area in Duval County and in cold blood shot and killed him with a .25 caliber pistol. After several shots to the head of the victim, the defendant placed the pistol at the head and chest and again pulled the trigger after the victim had fallen and appeared to be dead. The evidence is clear and convincing that the defendant was the actual perpetrator of the fatal shooting.

*793 E. WHETHER THE DEFENDANT ACTED UNDER EXTREME DURESS OR UNDER THE SUBSTANTIAL DOMINATION OF ANOTHER PERSON.

Finding: This mitigating factor is not present in this case. There is no evidence at all tending to show that the defendant [acted] under extreme duress or under the substantial domination of another person.
F. WHETHER THE CAPACITY OF THE DEFENDANT TO APPRECIATE THE CRIMINALITY OF HIS CONDUCT OR TO CONFORM HIS CONDUCT TO THE REQUIREMENTS OF LAW WAS SUBSTANTIALLY IMPAIRED.

Finding: This mitigating factor is not present in this case. There is no evidence at all tending to show that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
G. THE AGE OF THE DEFENDANT AT THE TIME OF THE CRIME.

Finding: The defendant is twentynine (29) years of age and was the same age at the time of the offense, having been born August 11, 1948. The Court finds that this mitigating element is not present.
AGGRAVATING ELEMENTS
A. WHETHER THE MURDER WAS COMMITTED BY A PERSON UNDER SENTENCE OF IMPRISONMENT.

Finding: This aggravating element is not present in this case. There is no evidence tending to show that the defendant was under sentence of imprisonment when the murder was committed.
B. WHETHER THE DEFENDANT WAS PREVIOUSLY CONVICTED OF ANOTHER CAPITAL FELONY OR OF A FELONY INVOLVING THE USE OR THREAT OF VIOLENCE TO THE PERSON.

Finding: This aggravating element is present in this case. The defendant was convicted of robbery in the first degree and attempted robbery in the first degree in 1965. On January 14, 1965 the defendant attempted to take money from the person of Mary Graves of Barnards Steak House in Sedgwick County, Kansas by putting the victim in fear and threatening violence to her person. On January 15, 1965 the defendant, by threat of violence to Henrietta Stathis of Stathis' Liquor Store, did take money. The defendant was convicted of the charge of robbery and attempted robbery on February 24, 1965. Both cases involved the display of a firearm.
C. WHETHER THE DEFENDANT KNOWINGLY CREATED A GREAT RISK OF DEATH TO MANY PERSONS.

Finding: This aggravating element is not present in this case. There is no evidence tending to show that the defendant knowingly created a great risk of death to many persons.
D. WHETHER THE MURDER WAS COMMITTED WHILE THE DEFENDANT WAS ENGAGED, OR WAS AN ACCOMPLICE, IN THE COMMISSION OF, OR AN ATTEMPT TO COMMIT, OR FLIGHT AFTER COMMITTING OR ATTEMPTING TO COMMIT, ANY ROBBERY, RAPE, ARSON, BURGLARY, KIDNAPPING, OR AIRCRAFT PIRACY OR THE UNLAWFUL THROWING, PLACING, OR DISCHARGING OF A DESTRUCTIVE DEVICE OR BOMB.

Finding: This aggravating element is not present in this case. The defendant took his wallet and identification but the court would not find that this murder was committed in the course of a robbery but that the taking of the property was an intricate part of the murder specifically providing the defendant with proof that the victim had, in fact, been killed.
E. WHETHER THE MURDER WAS COMMITTED FOR THE PURPOSE *794 OF AVOIDING OR PREVENTING A LAWFUL ARREST OR EFFECTING AN ESCAPE FROM CUSTODY.

Finding: This aggravating factor is not present in this case. There is no evidence that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
F. WHETHER THE MURDER WAS COMMITTED FOR PECUNIARY GAIN.

Finding: This aggravating factor is present in this case. The defendant for $5,000.00 and in a manner calculated only to obtain pecuniary gain shot and killed the victim.
G. WHETHER THE MURDER WAS COMMITTED TO DISRUPT OR HINDER THE LAWFUL EXERCISE OF ANY GOVERNMENTAL FUNCTION OR THE ENFORCEMENT OF LAWS.

Finding: This aggravating circumstance is not present in this case. There is no evidence that the murder was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of law.
H. WHETHER THE MURDER WAS ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL.

Finding: This aggravating circumstance is not present in this case. It is the Court's view that the shooting of the victim in this case was cruel, atrocious and unwarranted, not only in the actual killing but in disposing of the body and the taking of money from the deceased, but does not meet the legal status as defined by our Supreme Court in Cooper v. State, 336 So.2d 1133, 1140 (Fla. 1976).
CONCLUSION OF THE COURT
The Court has carefully considered the aforesaid mitigating and aggravating elements and its findings with respect thereto, which findings are based upon those portions of the record in this cause previously delineated herein at pages one and two of this Judgment and Sentence. The Court concludes that there are sufficient aggravating circumstances which exist to justify the sentence of death. The Court further concludes that there are no mitigating circumstances, statutory or otherwise.
.....
Downs argues that he was deprived of due process of law by a four-day delay and non-sequestering of the jury between the end of the guilt phase and the beginning of the penalty phase, that failure to instruct the jury during the sentencing phase that life imprisonment means a minimum of twenty-five years without parole denied him due process, that the death penalty statute violates the eighth and fourteenth amendments because it prevents the sentencers from considering non-statutory mitigating circumstances, and that the death penalty was not appropriate in light of the fact that Johnson was given immunity.
Downs was not denied due process by holding the penalty phase four days subsequent to the guilty phase of the trial, nor by the non-sequestering of the jury during this time. Section 921.141, Florida Statutes (1977), provides that the penalty proceedings shall be conducted before the jury "as soon as practicable." The jury verdict of guilty was returned at 10:20 Friday evening, and the court felt that it was unreasonable to commence penalty proceedings the next morning. Appellant's counsel requested that the sentencing advisory hearing be held as soon as possible and further stated that if the hearing was to be held Monday or Tuesday, he would prefer Tuesday. The sentencing hearing was held as soon as practicable after the guilty verdict. Furthermore, the trial judge expressly directed the jury to avoid any outside influences. The defense has not alleged that the jury violated the judge's directive. The trial court did not abuse its discretion in not sequestering the jury during this period of time between the guilty phase and the sentencing phase of the trial.
*795 Downs' argument that the exercise of prosecutorial discretion in granting Johnson immunity violated his constitutional rights and renders Florida's death penalty statute unconstitutional is without merit. The Supreme Court of the United States, in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), rejected a similar argument. Justices Stewart, Powell, and Stevens, in their separate opinion, stated:
First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.
The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. Furman, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.
428 U.S. at 199, 96 S.Ct. at 2937. Justice White, with whom Chief Justice Burger and Justice Rehnquist joined, said:
Petitioner's argument that there is an unconstitutional amount of discretion in the system which separates those suspects who receive the death penalty from those who receive life imprisonment, a lesser penalty, or are acquitted or never charged, seems to be in final analysis an indictment of our entire system of justice. Petitioner has argued, in effect, that no matter how effective the death penalty may be as a punishment, government, created and run as it must be by humans, is inevitably incompetent to administer it. This cannot be accepted as a proposition of constitutional law. Imposition of the death penalty is surely an awesome responsibility for any system of justice and those who participate in it. Mistakes will be made and discriminations will occur which will be difficult to explain. However, one of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder. I decline to interfere with the manner in which Georgia has chosen to enforce such laws on what is simply an assertion of lack of faith in the ability of the system of justice to operate in a fundamentally fair manner.
428 U.S. at 225-226, 96 S.Ct. at 2949. See also Proffitt v. Florida, 428 U.S. 242, 254, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976); Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978).
We find that the prosecutor's exercise of discretion did not deprive Downs of his constitutional rights, and we hold that the death penalty is not inappropriate merely because Johnson did not receive the same sentence as Downs. The present case is distinguishable from Slater v. State, 316 So.2d 539 (Fla. 1975), and is more analogous to Salvatore v. State, 366 So.2d 745 (Fla. 1978), and Smith v. State, 365 So.2d 704 (Fla. 1978).
*796 The trial court, in Slater, imposed the death penalty upon Slater after a jury recommendation of life, while the triggerman of the robbery-murder was permitted to plead nolo contendere to the charge of first-degree murder and received a life sentence. Slater was an accomplice and did not have the murder weapon in his hand. The Slater jury recognized these circumstances when it recommended life imprisonment, and we held that imposition of the death sentence under the particular facts of that case would not constitute equal justice under the law.
In Salvatore v. State, the defendant contended that imposition of the death penalty in his case was unconstitutional because his co-defendant was not sentenced to death. The jury, in Salvatore, recommended that the death penalty be imposed. We held that the death sentence should not be reduced merely because the co-defendant did not also receive a death sentence, and we affirmed Salvatore's sentence. We distinguished the facts in Salvatore from Slater and said:
The case sub judice is quite different. The defendant formulated the plan to kill the victim and was the actual perpetrator of the crime. Murren refused to hit the victim in the parking lot in accordance with the original plan. Also, Murren refused to hit the victim while he was in the office until after defendant had begun beating the victim with the pipe. The defendant, not Murren, beat the victim to death and Murren was responsible for the entire case being brought to light.

366 So.2d at 752 (emphasis supplied).
The record in the present case establishes that Johnson and Downs were not equally situated and reveals that Downs accepted the contract to kill, formulated the scheme, solicited Johnson's participation, and shot the victim, although Johnson had attempted to dissuade him from going through with the killing and even told Downs that he was not going to help him with the killing. Johnson testified that because he was fearful that Downs might shoot him, he went along with Downs, but again informed Downs that he was not going to kill Harris but Downs would have to do the killing himself. When Downs left Johnson with a machine gun, at the end of the dirt road to await Downs' and Harris' return, Johnson testified that he hid the gun under some boards because he had no intention of using it.
Later, while Downs was in Alabama, Johnson came forward and advised a detective for the Jacksonville sheriff's department of the murder. He testified that he had not come forward before because he was afraid that Downs would take revenge on him or his family and because he feared he would be arrested for the murder. With Downs far removed in Alabama, he no longer feared Downs' revenge. In response to Downs' assertion that it possibly was unnecessary for the State to grant immunity to Johnson in order to make its case, the State asserts that the state attorney undoubtedly believed that it was necessary and that his statements to the judge and jury reveal his good faith belief that the granting of immunity in exchange for Johnson's testimony and production of physical evidence was in the best interests of the State.
Johnson was responsible for the present case coming to light, and the jury was aware that Johnson had received immunity when it returned its advisory recommendation of death.
The remaining points raised by Downs relative to the imposition of the sentence of death are likewise without merit.
Accordingly, having found no reversible error, we affirm the judgments and sentences.
It is so ordered.
ENGLAND, C.J., and ADKINS, BOYD, OVERTON, SUNDBERG and ALDERMAN, JJ., concur.