512 So.2d 922 (1987)
Charles KIGHT, Petitioner,
v.
STATE of Florida, Respondent.
No. 65749.
Supreme Court of Florida.
July 9, 1987.
Rehearing Denied October 14, 1987.
*923 William J. Sheppard, Elizabeth L. White and Courtney Johnson of Sheppard and White, P.A., Jacksonville, for petitioner.
*924 Robert A. Butterworth, Atty. Gen. and Mark C. Menser, Asst. Atty. Gen., Tallahassee, for State.
EHRLICH, Justice.
Charles Kight appeals his conviction of first-degree murder and sentence of death. We have jurisdiction, article V, section 3(b)(1), and affirm both the conviction and sentence.
On December 7, 1982, Lawrence Butler, a black Jacksonville cab driver, was reported missing. Butler's body was found seven days later in a remote area of northside Jacksonville. The apparent cause of death was multiple (51) stab wounds to the upper region of his body. On the same day Butler was reported missing, Kight and codefendant, Gary Hutto, were arrested for the unrelated armed robbery of a second black cab driver, Herman McGoogin. McGoogin had identified the pair as the individuals who robbed him at knife point after he had picked them up at a Main Street bar. During Kight's pretrial incarceration on the McGoogin charge and while under investigation for the Butler murder, Kight admitted his presence during the murder but maintained that Hutto had robbed and murdered Butler. At Kight's trial, the main evidence against him consisted of his exculpatory statements to police, his admissions to "jailhouse informants" and McGoogin's testimony concerning the unrelated robbery.
Kight made three statements concerning the murder to police, all of which were admitted into evidence. In the most detailed of these statements, which was read to the jury, Kight recounted how Hutto approached him in a Main Street bar and asked if he wanted to go with him to visit a friend. Hutto had already called a cab and when it arrived the pair got in and Hutto directed the driver to a dirt road on the north side of town. Once on the dirt road, Hutto put a knife to the driver's throat and told him to stop the car. When the driver made an unexpected move, Hutto stabbed him in the chest. The driver then jumped from the car and ran. Kight described the rings, watch and knife taken from the driver and gave a detailed account of how Hutto continued the attack on Butler outside the car, finally cutting his throat "because he was still breathing." Kight described how Hutto then drove the car off a bridge into the river and hid the rings in a deserted house. After giving this statement Kight took the police first to where the car had been ditched and then to the house where the rings were hidden.
Four former inmates at the Duval County jail testified that on various occasions during his incarceration at that facility Kight bragged that he had killed Butler and was going to blame it on Hutto. A fifth inmate from the Duval County jail testified for the defense that Hutto had bragged to him about killing Butler and getting away with it.
On the defendant's request, Gary Hutto was called as a court witness. On cross-examination by the state Hutto testified that after spending the day of December 6 together drinking and taking drugs he and Kight left the R & R Bar on Main Street at about midnight. Hutto claimed he passed out outside the bar and the next thing he remembers he was sitting in the back seat of a cab. He testified that he got out of the cab to find Kight holding "some guy" down in the trunk stabbing him in the chest. When he asked Kight what he was doing, Kight responded "I robbed him, I got to kill him so he can't identify me." Kight then told the man to get up and the man ran about thirty or forty feet before he fell to the ground. Kight knealt down by the man but Hutto was unable to see what he was doing. Kight then returned to the car, got in, Hutto got in the back seat, and they drove to a bridge where Kight drove the car into the river. Hutto testified that he had blacked out after the incident and could not remember what had happened for four months.
Kight was convicted of first-degree murder. The jury recommended and the trial court imposed the death penalty. Kight raises seventeen issues in this appeal,[1] only ten of which warrant discussion.

*925 Guilt Phase

First, we address Kight's claim that the statements made to police concerning the murder should have been suppressed because they were obtained in violation of his fifth and sixth amendment rights. After a thorough review of the circumstances under which the statements were given, we conclude that although Kight's initial statement to police was obtained in violation of his fifth amendment rights, the two more detailed statements were properly admitted into evidence.
On December 7, 1982, upon his arrest in connection with the McGoogin robbery, Detective Weeks gave Kight his Miranda warnings. When Kight declined to talk, questioning ceased. On December 8, at his first appearance, Kight was appointed counsel in connection with the robbery charge. One week after his arrest, on December 14, while still in custody on the robbery charge, Kight was again given his rights and questioned by police. The scope of this interrogation was limited solely to the Butler murder. After waiving his rights, Kight stated that he had no knowledge of the murder. Three days later, on December 17, Detective Weeks accompanied Kight from his cell to the property room in order to seize Kight's clothing for the purpose of testing them for traces of the murder victim's blood. While outside the property room, Kight made the unprovoked statement that he was "not afraid of the chair." Officer Weeks then inquired "what chair are you talking about?" Kight replied "the electric chair because Hutto stabbed the [cab driver] and cut his throat and he's still got the man's watch." At this point Detective Weeks promptly interrupted Kight and advised him of his Miranda rights. Kight waived his rights and added that he knew the location of the taxi cab and the murder victim's rings. Kight was then taken to the homicide division where he was again advised of his rights by Detective Kesinger. Kight again waived his Miranda rights. During further interrogation by Detective Kesinger, Kight gave the detailed account of the murder which was read to the jury.
Kight claims these statements were taken in violation of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In Edwards the court held that once an accused has expressed a desire to deal with the police only through counsel, he cannot be subjected to further interrogation until counsel has been made available to him, unless the accused has himself initiated further communication, exchanges or conversations with the police. 451 U.S. at 485, 101 S.Ct. at 1885. As supplemental authority in support of his Edwards claim Kight directs our attention to the recent decision of the Seventh Circuit Court of Appeals in Espinoza v. Fairman, 813 F.2d 117 (7th Cir.1987). Faced with a fifth amendment claim based on a factual scenario virtually identical to that presented in this case, the seventh circuit held that when an accused has been appointed counsel, while in custody on one charge it is a violation of his fifth amendment rights thereafter, while he remains in continuous custody, to subject him, in the absence of counsel, to police-initiated interrogation about an unrelated crime. Compare Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). (No fifth amendment violation where an accused asserts his right to remain silent in connection with one charge and is subsequently, while still in custody, questioned solely about an unrelated charge.) After concluding that by accepting counsel at his arraignment on a weapons charge, Espinoza had invoked his "fifth amendment right to counsel," the *926 seventh circuit reasoned that this invocation remained in effect because the custodial interrogation concerning an unrelated murder occurred while Espinoza remained in continuous police custody and because interrogation was police initiated, Espinoza was incapable of waiving his rights. 813 F.2d at 122. Even if we were to adopt the seventh circuit's holding in Espinoza, there was no Edwards violation in this case because it was Kight who initiated the conversation outside the property room when he made the unprovoked statement to Detective Weeks that he was "not afraid of the chair." We cannot agree with Kight's contention that the mere removal of him from his cell in order to obtain a change in clothing constituted action on the part of the police that was reasonably likely to evoke an incriminating response, thus, amounting to an interrogation under Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980).
However, although we find no Edwards violation, Kight was entitled to a fresh set of warnings before further interrogation in connection with the Butler homicide. Kight was clearly in custody for Miranda purposes when the December 17 statements were obtained. Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). Detective Weeks' inquiry "what chair?" constituted interrogation. The statement was an express question which was reasonably likely to and, in fact, did elicit an incriminating response. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297. Thus, Kight's initial statement to Detective Weeks should have been suppressed as the product of an unwarned custodial interrogation under Miranda. However, because the subsequent advisement of his rights by Detective Weeks and later by Detective Kesinger cured any technical procedural violation of Miranda, Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), Kight's subsequent statements to Weeks and Kesinger were properly admitted into evidence. We stress that these statements are admissible only because Kight's initial unwarned statement and subsequent warned statements were voluntarily made and not the result of any actual coercion. See Id. We, therefore, conclude that although it was error to admit Kight's initial statement to Officer Weeks, this error was harmless because the unwarned statement was merely cumulative to the subsequent properly admitted statements.
Kight's assertion that his statements to police were not voluntarily made because he could not have understood and intelligently waived his Miranda rights is without merit. Although there was expert testimony that Kight's I.Q. is only sixty nine, mental weakness is but one factor to be considered in determining the voluntariness of a confession. Ross v. State, 386 So.2d 1191, 1194 (Fla. 1980). The record clearly illustrates that Kight understood his constitutional rights and knowingly and intelligently waived them. Not only did Kight affirmatively acknowledge his comprehension of the rights described to him, he evidenced a full awareness of the nature of the rights being abandoned and the consequences of abandonment. See Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 1141-42, 89 L.Ed.2d 410 (1986). Kight's assertion of his rights on December 7 further supports the conclusion that he had the capacity to understand and assert his rights.
Kight's claim that the statements linking him to the murder were obtained in violation of his sixth amendment right to counsel under the United States Constitution is equally futile. Kight maintains that he had a sixth amendment right to counsel during interrogation concerning the murder because he had been appointed counsel on the unrelated robbery charge. Such a claim was squarely rejected by the seventh circuit in Espinoza because "the state had not begun to prosecute Espinoza for the ... murder at the time he confessed." 813 F.2d at 120.
A similar claim has also been rejected by the United States Supreme Court in Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). In Moulton, in what has been referred to as a "surreptitious investigation," police obtained incriminating *927 statements pertaining to two crimes, one for which the defendant had been indicted, the other for which he had not. The Court concluded that although the evidence relating to the charge for which Moulton had been indicted had been obtained in violation of his Sixth Amendment right to counsel and thus, was inadmissible, "to exclude evidence pertaining to charges as to which the sixth amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities." 106 S.Ct. at 489. It is clear that the sixth amendment right to counsel does not attach until "after the initiation of formal charges." Moran v. Burbine, 106 S.Ct. at 1146. Kight had not been formally charged with the Butler murder at the time he made the statements he now seeks to suppress. Therefore, he had no sixth amendment right to counsel in connection with that charge at the time of interrogation.
We also reject Kight's claim that the statements to Detective Weeks and Kesinger were inadmissible because they were "introduced solely to show that [Kight] had made contradictory statements about the murder" and, therefore, were irrelevant because Kight had not placed his credibility in issue. It is clear from the record that the statements were offered to show Kight's presence at the time of the murder and the extent of his knowledge of the crime. We find no error in the trial court's admission of these statements.
Kight claims that the warrantless seizure of his clothing violated his rights under the fourth amendment of the United States Constitution and under article I, section 12 of The Florida Constitution. We reject this argument because we find that at the time of the seizure Kight had no reasonable expectation of privacy in the clothing on his person. It is recognized that a pretrial detainee such as Kight, has a diminished expectation of privacy with respect to his room or cell. Bell v. Wolfish, 441 U.S. 520, 557, 99 S.Ct. 1861, 1883, 60 L.Ed.2d 447 (1979). It is also recognized that once a person is lawfully arrested, he has a reduced expectation of privacy in the effects on his person. United States v. Chadwick, 433 U.S. 1, 16 n. 10, 97 S.Ct. 2476, 2486 n. 10, 53 L.Ed.2d 538 (1977); United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); United States v. Monclavo-Cruz, 662 F.2d 1285, 1290 (9th Cir.1981). In this case, although Kight's clothing was seized solely for the purpose of testing it for the murder victim's blood, his clothing could have been seized for legitimate health or security purposes at any time during his detention. The fact that while in jail Kight could not have reasonably expected to have exclusive control over the clothing on his person removed any reasonable expectation of privacy which he may have otherwise had. Having no reasonable expectation of privacy in the clothing seized, neither the fourth amendment to the United States Constitution nor article I, section 12 of the Florida Constitution offers Kight the protection claimed. See Wolfish, 441 U.S. at 557, 99 S.Ct. at 1883. The trial court's denial of Kight's motion to suppress was, therefore, not error.
Next, Kight argues that the trial judge erred in admitting McGoogin's testimony concerning the December 7 robbery and in failing to give an instruction limiting consideration of this testimony to the issue of identity. Kight contends that this collateral crime evidence was admitted merely to show bad character or propensity to commit crimes contrary to the principles set forth by this Court in Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959) and codified in section 90.404(2)(a), Florida Statutes.
McGoogin testified that he picked up Kight and Hutto outside a Main Street bar. Hutto directed him to a road on the north side of town where Hutto instructed him to stop. Kight then put a knife to McGoogin's throat saying "don't move, you black nigger, you black son of a bitching nigger." As Kight held the knife at McGoogin's throat, Hutto said to Kight "What in the hell are you going to do?" and placed his *928 hand on Kight's hand pressing the knife against McGoogin's throat. McGoogin grabbed Kight's wrist trying to push the knife away. During the struggle the knife fell to the back seat and McGoogin was able to get out of the car and run to safety. At some point during the struggle over the knife Kight took twenty dollars from McGoogin's pocket.
We find no error in the court's admission of McGoogin's testimony or in the limiting instruction given.[2] In the instant case, there is more than a "mere general similarity" between the facts of the McGoogin robbery and the Butler murder. Compare Thompson v. State, 494 So.2d 203 (Fla. 1986); Peek v. State, 488 So.2d 52 (Fla. 1986); Drake v. State, 400 So.2d 1217 (Fla. 1981). The details of the two offenses are strikingly similar: 1) the crimes occurred on the same day; 2) the victims were both black cab drivers; 3) on both occasions Hutto and Kight were picked up outside a Main Street bar; 4) both drivers were taken to the same general area of town; 5) a knife was used in both incidents; and 6) both victims were robbed. These points of similarity "pervade the compared factual situations" and when taken as a whole are "so unusual as to point to the defendant". Drake v. State, 400 So.2d at 1219. The major dissimilarity is the fact that McGoogin fortuitously escaped with his life. Under these facts, evidence of the collateral crime was relevant to prove not only identity, it was also relevant to show motive and intent. The fact that both drivers were black and that Kight made racist remarks to McGoogin evidence a racial motive for the crimes and is probative on the issue of intent. We find, therefore, that McGoogin's testimony was proper Williams rule evidence.
Also in connection with McGoogin's testimony Kight argues that the trial court erred in restricting his cross-examination of McGoogin. During his cross-examination defense counsel sought to elicit McGoogin's "interpretation" of what Hutto meant by his words and actions. McGoogin testified that after Kight put the knife to his throat, Hutto asked Kight "What in the hell are you going to do?" Cross examination then continued as follows:
Q. All right. Did you interpret that statement by Gary Hutto directed to Charles Kight as a dare for him to do something with that knife?
A. Yes.
[State]: I object your honor: that calls for a conclusion on the part of the witness.
The Court: I will sustain the objection and I will strike the question and response from the record and instruct the jury to disregard the question and response.
Q. How did you interpret the statement by Gary Hutto directed to Charles Kight, what in the hell are you going to do?
[State]: I again will object.
The Court: The same ruling. I will sustain the objection.
...
Q... . . When Charles Kight had his hand with the knife by your throat [Hutto] said to Charles Kight What in the hell are you going to do what did [Hutto] then do with his hand?
A. That's when he had taken his hand and put it on this guy here hand, pressing the knife against my throat.
Q. It appeared to you that he was trying  .
*929 The state's objection on the ground that the question was calling for a conclusion on the part of the witness was again sustained by the court.
During proffer McGoogin testified that in his opinion Hutto was encouraging Kight to cut his throat.[3] Kight now argues that McGoogin's lay opinion that Hutto was urging Kight to harm him was admissible under section 90.701, Florida Statutes (1985) because McGoogin was merely testifying as to his perception of Hutto's words and actions. We cannot agree.
Although it may have been McGoogin's perception that Hutto was urging Kight to harm him, this is not the type of lay opinion testimony which is admissible under section 90.701. Under section 90.701, before a lay witness may testify in the form of inference and opinion the party offering the testimony must establish that "the witness cannot [otherwise] readily, and with equal accuracy and adequacy, communicate what he has perceived to the trier of fact" and that the witness' "use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party." Kight has failed to establish that McGoogin could not have otherwise communicated his perceptions concerning Hutto to the jury. To the contrary, the record reflects that on direct examination McGoogin adequately explained to the jury that Hutto "placed his hand on [Kight's] hand and started pressing the knife against me." On cross examination McGoogin explained that after Hutto asked Kight "What the hell are you going to do?", Hutto "put [his hand] on [Kight's] hand, pressing the knife around my throat." In this case, McGoogin's perception of the incident was adequately conveyed to the jury, thus, equipping it with the information necessary to draw the inference urged by the defense. There was, therefore, no need for resort to testimony concerning McGoogin's interpretation of the situation.
Two points Kight raises on appeal involve the exclusion of testimony concerning Kight's mental capacity. Kight argues that the trial court erred in 1) restricting his cross-examination of Detective Weeks concerning Kight's mental capacity and 2) excluding expert testimony of his mental condition which was offered in support of his defense. We find no error in the court's exclusion of this testimony.
After Detective Weeks testified that Kight's cell was on the mezzanine floor of the jail, defense counsel attempted to ask him whether he was aware that "some inmates" housed on that floor were there as a result of their "mental condition." Because no insanity defense had been filed, the court sustained the state's objection on relevancy grounds.
It is well established in Florida, that in the absence of a plea of not guilty by reason of insanity, testimony concerning a defendant's mental state is inadmissible during the guilt phase of a trial. Zeigler v. State, 402 So.2d 365, 373 (Fla. 1981), cert. denied, 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982); Tremain v. State, 336 So.2d 705 (Fla. 4th DCA 1976), cert. denied, 348 So.2d 954 (Fla. 1977). Kight recognizes the above rule but contends that his mental retardation is a part of the total circumstances under which the confession was made and, as such, is a factor to be considered by the jury in determining the weight to be given the statement. Kight relies heavily on the United States Supreme Court's recent decision in Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 *930 L.Ed.2d 636 (1986) in which the Court held that testimony about the physical and psychological environment in which a confession was obtained is admissible by the defense to cast doubt on the statement's credibility.
In Crane, the defendant, who was sixteen at the time of the murder for which he was charged, sought to introduce testimony describing the length of interrogation and the manner in which the interrogation was conducted in an attempt to show that the statement was unworthy of belief. The trial court ruled the testimony inadmissible. On appeal, the Kentucky Supreme Court upheld the exclusion, reasoning that the testimony "related solely to voluntariness," Crane v. Commonwealth, 690 S.W.2d 753, 754 (Ky. 1985), a legal issue to be determined by the trial court. The United States Supreme Court reversed, finding the reasoning of the Kentucky Supreme Court "directly at odds" with several of the Court's prior opinions, 106 S.Ct. at 2144, see Lego v. Twomey, 404 U.S. 477, 485-86, 92 S.Ct. 619, 624-25, 30 L.Ed.2d 618 (1972) and Jackson v. Denno, 378 U.S. 368, 377-78, 84 S.Ct. 1774, 1781-82, 12 L.Ed.2d 908 (1964), and in conflict with "decisions of every other state to have confronted the issue." 106 S.Ct. at 2146, citing Beaver v. State, 455 So.2d 253, 256 (Ala. Crim. App. 1984); Palmes v. State, 397 So.2d 648, 653 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981). The Court noted that under its decisions in Lego and Jackson "`evidence surrounding the making of a confession bears on its credibility' as well as its voluntariness." 378 U.S. at 386 n. 13, 84 S.Ct. at 1786 n. 13. This general proposition was recognized by this Court in Palmes v. State, where we stated:
Once a confession is admitted into evidence, ... the defendant is entitled to present to the jury evidence pertaining to the circumstances under which the confession was made. The reason for this rule is that it is the jury's function to determine the weight to be accorded the confession in determining guilt.
397 So.2d at 653.
We cannot agree with the appellant that the testimony he sought to elicit from Detective Weeks concerning his mental capacity was admissible as a circumstance surrounding his confession. Unlike the defendants in Crane and Palmes Kight did not seek to introduce this evidence in an attempt to cast doubt on the credibility of his confession. To the contrary, Kight's main objective in getting the evidence of his mental condition before the jury was to bolster the credibility of his story that Hutto did it. We do not read the Crane decision to require evidence of a defendant's mental capacity under circumstances such as these. Further, it does not appear to us that the testimony which the defense sought to elicit from Detective Weeks was relevant to the circumstances surrounding the confession. The only question asked of Detective Weeks dealt with whether Weeks was aware that some of the inmates housed on the mezzanine (where Kight's cell was located) were there as a result of their mental condition. Defense counsel proffered no testimony concerning Weeks' personal knowledge of Kight's mental incapacity. We decline to look to testimony elicited during a suppression hearing to determine whether relevant evidence may have been forthcoming.
Likewise, we cannot agree with Kight that the expert testimony of clinical psychologist, Dr. Krop, concerning Kight's mental state was impermissibly excluded in violation of his due process rights. Kight directs this Court's attention to a recent decision of the Arizona Supreme Court, State v. Gonzales, 140 Ariz. 349, 681 P.2d 1368 (1984). In Gonzales, the Arizona Supreme Court held that a trial court's refusal to permit expert defense testimony regarding Gonzales' retardation and organic brain syndromes violated his due process rights because this testimony was vitally relevant to Gonzales' mere presence defense. The Gonzales court also held the expert testimony admissible to explain Gonzales' demeanor on the witness stand. Gonzales had been charged with kidnapping and sexual assault, both of which are specific intent crimes under Arizona law. The court concluded that the expert testimony, if admitted, may have led the jury to *931 conclude that Gonzales could not have "knowingly" restrained the victim because he was incapable of understanding that not helping her was effectively restraining her. 140 Ariz. at 352, 681 P.2d at 1371.
In the instant case, during proffer by Defense Counsel, Dr. Krop testified that Kight is borderline mentally retarded with an IQ of sixty nine, that he is "a very dependent" and "passive" person who is "easily influenced" and would "generally be a follower." This testimony was not offered to explain Kight's behavior on the witness stand; Kight never took the stand. Nor was it offered in connection with Kight's statement to police. Kight sought to introduce Dr. Krop's testimony to show that he was "mentally incapable of devising the scheme to direct Mr. Butler to a deserted area and kill him." The testimony was also offered to rebut what Kight refers to as the state's theory that he fabricated the statement blaming Hutto. The type of testimony excluded in this case is much like the testimony excluded in Tremain, 336 So.2d 705. In Tremain, expert testimony that the defendant was dependent on others and lacked willpower was offered in furtherance of his defense of entrapment. In affirming the exclusion of testimony concerning a defendant's mental condition in the absence of a plea of not guilty by reason of insanity the Fourth District Court stated:
It is our opinion that to allow expert testimony as to mental state in the absence of an insanity plea would confuse and create immaterial issues. If permitted, such experts could explain and justify criminal conduct. As lay people we could guess that almost everyone who commits crimes against society must have some psychiatric or psychological problem. However, the test continues to be legal insanity as defined and not otherwise, and the court and jury should not be subjected to testimony as to mental flaws and justifications where the defendant knew the difference between right and wrong at the time of the crime.
336 So.2d at 708. We agree with this reasoning and adhere to the rule set forth in Zeigler excluding testimony such as this during the guilt phase where no insanity defense has been filed.
Even if we were to agree with Kight that it was error in this case to exclude testimony of his mental capacity, it can safely be concluded that any error was harmless beyond a reasonable doubt. During the sentencing phase of the trial the substance of the testimony which was excluded during the guilt phase was presented to the jury. Aware of Kight's mental retardation and of the fact that he was a dependent, passive person, the penalty phase jury not only recommended that Kight be sentenced to death but it specifically found that Kight "actually" killed Butler.
Kight does not challenge the sufficiency of the evidence supporting his conviction. However, we have reviewed the record and find sufficient evidence to support Kight's conviction for first-degree murder.

Penalty Phase
Kight argues that the trial court's positive instruction to the jury to feel free to discuss their guilt phase deliberations with whomever they wished prior to the sentencing phase of the trial deprived him of an impartial sentencing jury. On June 4, 1984, after the jury returned a verdict of guilty, the trial judge continued the sentencing proceedings until June 13. Before allowing the jury to disperse the court instructed them as follows:
No juror can ever be required to talk about the discussion that occurred in the jury room except by court order. I am going to tell you that you can talk to anyone you wish concerning your discussions in the jury room. You may also refrain from doing so. The court suggests that if you wish to speak about your deliberations that you wait until after the second stage of this trial: However, you have the right to speak to anyone and you cannot be compelled to speak to anyone without an order of this court or a court of competent jurisdiction. (emphasis added).
*932 A timely objection by defense counsel was overruled. A defense motion to discharge the jury based on the trial court's failure to admonish the jury as required by section 918.06, Florida Statutes (1983) was subsequently denied.[4]
Before proceeding with the sentencing hearing, which was ultimately conducted on July 13, 1984, defense counsel requested individual voir dire of jurors by counsel. This request was denied and the trial court conducted a collective inquiry of the jurors. When asked: "[H]ave any of you discussed your views toward this case or what the penalty should be in this case with anyone, or has anyone discussed that with you or asked you to take a position in any way?", Juror Perry responded that he had discussed his views on the death penalty in "idle conversation" but stated that his attitude towards the death penalty had not changed as a result of this discussion. A second juror informed the court that she had "run into" Detective Kesinger and that the extent of their conversation concerning the case was that she was a juror. At this point, defense counsel renewed his request for individual voir dire by counsel. The trial judge denied the request, concluding that he had "sufficiently and adequately covered the area."
We agree with Kight that the trial court's positive instruction to the jury to feel free to discuss their deliberations during the recess was highly improper. However, we find that the subsequent voir dire as conducted by the trial court was adequate to ensure appellant's right to an impartial sentencing jury. See, e.g., Diaz v. State, 435 So.2d 911 (Fla. 4th DCA 1983). Moreover, Juror Perry, the only Juror who discussed his feelings about the death penalty, was later discharged from further service for unrelated reasons, over defense objections.
Although we find that a new sentencing hearing is not mandated in this case, we note our strong disapproval of the trial court's decision to give such an instruction prior to sentencing deliberations in a capital case. Although there is no requirement that a jury be sequestered between the guilt and the penalty phases of a trial, a cautionary instruction to avoid outside influences is warranted before dispersal. See Downs v. State, 386 So.2d 788, 794 (Fla.), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 238 (1980). A capital jury's duties are not complete until its recommendation as to the appropriate sentence is made. While an instruction to the jury to feel free to discuss their deliberations with others is appropriate prior to final discharge of the jury, see Standard Jury Instruction (Crim.) 3.07 "Instruction upon Discharge of Jury", such an instruction is clearly improper prior to the conclusion of the jury's duties.
The trial court found two aggravating circumstances: 1) the murder occurred during the commission of a robbery, section 921.141(5)(d), and 2) the murder was especially heinous, atrocious, or cruel, section 921.141(5)(h), and two-non statutory mitigating circumstances: 1) Kight once apprehended a robber and 2) codefendant Hutto could not receive the death penalty because of his plea to second-degree murder. Kight does not challenge the aggravating factors found but maintains that the trial court abused his discretion in failing to find certain statutory and non statutory mitigating circumstances. Kight argues that "unrefuted" evidence of his mental retardation and deprived childhood established: 1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance, section 921.141(6)(b); 2) the defendant acted under extreme duress or under the substantial domination of another, section 921.141(6)(e); and 3) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially *933 impaired, section 921.141(6)(f). Kight also maintains that it was error for the trial court to have failed to consider Kight's mental retardation and deprived childhood as non-statutory mitigating circumstances.
We find no error in the trial court's failure to find these mitigating factors applicable. A trial court has broad discretion in determining the applicability of mitigating circumstances urged. Johnston v. State, 497 So.2d 863, 871 (Fla. 1986); Daugherty v. State, 419 So.2d 1067, 1071 (Fla. 1982), cert. denied, 459 U.S. 1228, 103 S.Ct. 1236, 75 L.Ed.2d 469 (1983). It is clear from the trial court's sentencing order that he considered all the evidence presented in both the guilt and penalty phases of the trial and all the statutory mitigating circumstances urged by the defense. There was competent substantial evidence to support the trial court's rejection of these mitigating circumstances. See Stano v. State, 460 So.2d 890, 894 (Fla.), cert. denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985). Likewise, we find no error in the trial court's failure to find Kight's low IQ and history of abusive childhood as non-statutory mitigating factors. See Mills v. State, 462 So.2d 1075, 1081 (Fla.), cert. denied, 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 661 (1985) (trial court need not consider low intelligence alone as mitigating circumstance.); and Lara v. State, 464 So.2d 1173, 1180 (Fla. 1985) (trial court need not consider history of abusive childhood as mitigating factor where murder was not significantly influenced by childhood experiences.)
We also reject Kight's argument that death is inappropriate in this case. Kight relies on this Court's decisions in Slater v. State, 316 So.2d 539 (Fla. 1975) and Jones v. State, 332 So.2d 615 (Fla. 1976). In Slater, we found that imposition of the death penalty against a mere accomplice was unconstitutionally applied where the actual "trigger man", who entered a plea of nolo contendre received a life sentence. 316 So.2d at 542. The facts in this case are not "the same or similar" to those in Slater. In the instant case there was sufficient record support for the jury's conclusion that Kight "actually" killed Butler.
We also find Jones v. State distinguishable. Jones involved a jury override and the fact that Jones "suffered a paranoid psychosis" was considered an overriding mitigating factor supporting the jury's recommendation. 332 So.2d at 619. From our review of the entire record, the death penalty was proportionately imposed.
Prior to the instant appeal, Kight filed a "Motion for Leave to File Petition for Writ of Coram Nobis," which was denied. The motion alleged that defense counsel had just discovered undisclosed concessions made to state witnesses in return for their testimony. Kight now asks this Court to consider, on the merits, these alleged Brady[5] violations. Because these newly discovered violations have not been presented to the trial court, we do not reach the merits of this claim. Kight may properly raise this claim before the trial court in a rule 3.850 motion for post conviction relief, thus giving the trial court an opportunity to determine if the alleged undisclosed concessions were in fact made and, if so, whether a new trial is mandated under the standards set forth by the United States Supreme Court in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
Kight has failed to demonstrate reversible error in his conviction or sentence. Accordingly, we affirm the conviction and sentence of death.
It is so ordered.
McDONALD, C.J., and OVERTON, SHAW and BARKETT, JJ., and ADKINS, J. (Ret.), concur.
NOTES
[1] We find the following claims are without merit and do not warrant discussion: the trial court erred in denying the motion to suppress evidence obtained during the initial investigatory stop in connection with the McGoogin robbery; the trial court erred in denying the motion to suppress McGoogin's identification of Kight at the scene of his arrest; the trial court erred in refusing to exclude the testimony of jail house informants; the trial court erred in denying the motion to dismiss based upon discrimination in selection of grand jury foreperson; the trial court erred during jury selection in its disposition of challenges for cause based on expressed opinions for and against the death penalty; improper closing argument by the state rendered appellant's sentence fundamentally unfair; the cumulative effect of the alleged errors rendered Kight's trial fundamentally unfair.
[2] After McGoogin testified, the trial court instructed the jury:

Ladies and gentlemen, you are now instructed that you have heard testimony concerning a separate criminal offense by the defendant. You are instructed that the evidence is offered for the limited purpose of proving that the defendant had the motive, intent and knowledge of the robbery of Lawrence D. Butler, that his identity is established, its offered for that proof and that there is no (sic) absence of mistake or accident by the defendant in the robbery of Lawrence D. Butler.
The defendant is not on trial for the crime of robbing Herman McGoogin and the only offense for which the defendant is on trial is that charged in the indictment.
This instruction is substantially the same as Florida Standard Jury Instruction on Williams rule evidence. Florida Standard Jury Instruction (Crim.), "Williams Rule." reads:
The evidence you are about to receive concerning evidence of other crimes allegedly committed by the defendant will be considered by you for the limited purposes of proving [motive] [opportunity] [intent] [preparation] [plan] [knowledge] [identity] [the absence of mistake or accident] on the part of the defendant and you shall consider it only as it relates to those issues.
However, the defendant is not on trial for a crime that is not included in the [information] [indictment].
Although we agree with appellant that a trial judge should limit a Williams rule instruction to those bracketed elements that are applicable under the facts of the case, failure to so limit the instruction is not considered error. See Wright v. State, 473 So.2d 1277, 1281 at n. * (Fla. 1985).
[3] When questioned about the McGoogin robbery by defense counsel Gary Hutto testified that he was trying to save McGoogin by pulling Kight's hand away from McGoogin's throat.
[4] Section 918.06 provides in pertinent part:

Separation and detention of jurors; admonition by court  The court shall admonish the jury that it is their duty not to converse among themselves or with anyone else on a subject connected with the trial or to form or express an opinion on a subject connected with the trial until the cause is submitted to them.
[5] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).