894 So.2d 126 (2004)
Demetris Omar THOMAS, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-1092.
Supreme Court of Florida.
November 18, 2004.
Rehearing Denied January 5, 2005.
*127 Nancy A. Daniels, Public Defender, and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, Carol M. Dittmar, Senior Assistant Attorney General, Tampa, FL, and Stephen R. White, Gary Milligan and Cassandra K. Dolgin, Assistant Attorneys General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a death sentence upon Demetris Omar Thomas. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm the convictions of first-degree murder, kidnapping, and sexual battery with the use of a deadly weapon or physical force. We treat Thomas's mental retardation claim as a motion pursuant to Florida Rule of Criminal Procedure 3.203 and relinquish jurisdiction to the circuit court for consideration *128 in accord with rule 3.203(e) of whether Thomas is mentally retarded.

FACTS
At about 3 a.m. on Saturday, September 13, 1997, Brandy Howard was using a pay phone at the Tom Thumb Food Store (store) in Okaloosa County. A clerk at the store was blowing the parking lot with an electric leaf blower. The clerk saw Demetris Omar Thomas drive up next to Howard's vehicle and honk the horn of his vehicle. Howard raised her hand as if she were telling Thomas to wait a minute. Thomas drove away. A few minutes later, the clerk saw Thomas approach Howard on foot, at which point Thomas and Howard began tensely gesturing to one another. The clerk saw Thomas snatch Howard's keys from Howard and, over the noise of the blower, heard Howard say, "Hey." Howard then made what appeared to be a smile towards the clerk. At this point the clerk believed that the two were just having an argument.
The clerk then saw Thomas push Howard into the passenger side of the vehicle and close the door. Thomas started walking around the vehicle, and Howard opened the passenger door. Thomas came back around the vehicle and closed the passenger door. He again started walking around the vehicle, and the passenger door opened a second time. Thomas again returned and closed the door. At that point, the clerk saw Thomas lean into the passenger side of the vehicle, where he apparently "says or does something" to Howard. Thomas then moved quickly to the driver's side of the vehicle and drove the vehicle out of the parking lot.
At 5:15 a.m. that same morning, Howard's body was discovered on Louise Drive, a dead-end cul-de-sac road where several houses were under construction (Louise Drive scene). Her vehicle was found parked approximately 109 feet from her body. The medical examiner later determined that Howard had been beaten to death with a blunt object, receiving at least seventeen blows to the face. Several of her teeth had been knocked out of her mouth. She also had what appeared to be defensive wounds to her hands and fingers. Additionally, the medical examiner found that Howard might have been hit on each side of her head with a hand or fist. Semen was found in Howard's vagina that was later matched to Thomas's DNA. There was, however, no evidence of trauma to Howard's genitals.
On September 24, 1997, the police obtained and executed a search warrant for Thomas's home and person. Investigator Jerome Worley read Thomas his Miranda[1] rights while Thomas was in his bedroom changing his clothes. Thomas acknowledged that he understood his rights. As Worley and Officer Dennis Haley drove Thomas to the jail to have blood samples collected, Thomas made unelicited statements that he knew Howard and had sex with her on Thursday night. According to Worley and Haley, Thomas stated that after Howard gave him a ride to a McDonald's restaurant, he and Howard got into Thomas's grandfather's vehicle and drove behind a hospital, where he and Howard had sexual intercourse.
At the jail, Worley read Thomas his rights from a police department rights form. After being given the form to read, Thomas responded that he understood his rights. The form was signed by Thomas, Worley, and Haley. Thomas then indicated that he was willing to waive those rights and to speak with Worley and Haley. Thomas signed an additional line on the form which signified that he was willing *129 to make a statement without an attorney being present.
After initially denying involvement with Howard's murder, Thomas confessed to murdering Howard. Thomas told Worley and Haley that about a month prior to the date of the questioning, Thomas had been driving his vehicle and saw Howard following him. When he pulled off the road and got out of his vehicle, two black males exited Howard's vehicle, physically beat Thomas, and stole his vehicle. Thomas reported the theft of his vehicle to the sheriff's department but did not mention that he had been beaten.[2]
Thomas stated that he kept the event bottled up inside until he saw Howard at the store pay phone. He accosted Howard and asked her why she had set him up to have his vehicle stolen. Thomas admitted snatching Howard's keys from her, grabbing her by the arm, and directing her to her vehicle. He then alleged that he drove her vehicle behind the North Okaloosa Medical Center (hospital scene), where he and Howard began talking on a romantic level. He told Worley and Haley that he and Howard had consensual sex in the front passenger seat of her vehicle. Thomas said that he was initially using a condom but that he took it off and threw it out the window. Worley questioned Thomas about blood that was found inside the vehicle and on the tops and bottoms of Howard's socks. Thomas stated that Howard's nose bled during intercourse and that she used the socks to wipe her nose. Upon completion of the intercourse, Thomas said that he and Howard left the hospital scene and drove to the Louise Drive scene.
Thomas stated that he then confronted Howard about her role in stealing his vehicle. Thomas admitted that he slapped Howard at some point while she was in or near the vehicle. He claimed that Howard became agitated, exited the vehicle, and began throwing bricks at Thomas. He then stated that when he tried to get her back into the vehicle, Howard picked up a pipe and struck him on the left side of his face. Thomas said that he "snapped," took the pipe from Howard, and beat her with it. He asked Worley and Haley to look at where Howard struck him with the pipe. Neither Worley nor Haley could see any injuries on Thomas. Thomas then agreed to a tape-recorded interview, where he restated his confession.
Thomas accompanied officers to the hospital scene and pointed out the location where he and Howard had parked and allegedly had sexual intercourse. A bloodied beach towel was recovered from the hospital scene.[3] Thomas then directed officers to the Louise Drive scene. Thomas showed Investigator Steven Whatmough where he had thrown the long section of pipe used to kill Howard, but investigators could not locate it. The next morning, at a nearby construction site, investigators located an eight-foot scaffolding brace that was bent and had what appeared to be hair and blood on it.
Thomas's trial commenced on February 29, 2000. In addition to calling the store clerk, Worley, Haley, and Whatmough, the State called Janice Johnson as an expert in the field of crime scene analysis and blood stain pattern interpretation. Johnson testified regarding her analysis of the Louise Drive scene, including the locations of *130 blood spatter. She also testified about evidence she collected when Dr. Michael Berkland conducted an autopsy and sexual assault assessment on Howard. During the autopsy, Howard's clothing was removed, and trace materials of seed and vegetation were recovered from Howard's right thigh and pubic hair region. It was Johnson's opinion that the seed and vegetation were deposited while Howard was undressed.
Johnson also noted that although Howard's body was found with her shoes on, Howard's socks were soiled and were bloodied on the tops and bottoms. The blood on the tops of the socks was consistent with blood being dropped, while the blood on the bottoms was consistent with Howard stepping in blood with her shoes off. Johnson further testified that the headlining above the passenger seat of the car had spots which presumptive tests indicated were blood, although lab technicians could not draw a DNA type from the headlining to conclusively determine that the headlining sample was blood. Johnson stated that the spatter pattern was indicative of a forceful injury occurring inside the vehicle. There was also blood on the upper leg areas of Howard's jeans that was consistent with Howard dripping large drops of blood on her jeans while in a seated position.
The State called Dr. Berkland, who testified that in addition to numerous lacerations and internal injuries to Howard's skull, Howard's body had internal injuries suggesting manual strangulation. There were, however, no ligature marks or external injuries to Howard's neck. Dr. Berkland also testified that the absence of trauma to Howard's genitals did not rule out the possibility that a forcible sexual battery occurred. Additionally, Dr. Berkland opined that the blood on the bottom of Howard's socks had been deposited when Howard was shoeless.
Jack Remus, an expert in DNA examination and comparison, testified that he DNA-typed several of the suspected blood samples. Blood samples taken from the exterior of Howard's vehicle, from Howard's socks, and from the towel found at the hospital scene were consistent with Howard's DNA. Several suspected blood samples taken from the driver's side of Howard's automobile were consistent with Thomas's DNA.
Lastly, the State played Thomas's taped confession. The State rested its case, and Thomas moved for judgment of acquittal for all charges. The trial court denied the motion as to all three charges.
Thomas called Laura Bradley, Howard's best friend, who testified that Howard dated African-American men and that Howard suffered from occasional nose bleeds. On cross-examination, Bradley stated that all of the drops she had seen from Howard's nose bleeds would not fill a baby's eyedropper. Bradley further testified that she had never seen Howard interact with Thomas and that Howard had never identified Thomas as a romantic partner.
Thomas additionally called two of his friends, who testified that Thomas and Howard were hugging and kissing in the store parking lot on the night of the murder and that Howard drove from the store with Thomas in the passenger seat. Thomas lastly called his aunt, Linda Hutchinson, who testified that five or six weeks before the murder, she had given Thomas condoms while Howard was with him.
The jury convicted Thomas of first-degree murder, kidnapping, and sexual battery with the use of a deadly weapon or physical force.
*131 During Thomas's penalty phase, the State called Thomas's probation officer, who testified that at the time of Howard's murder, Thomas was on parole for committing a robbery without a weapon, a second-degree felony. The State also called a clerk who worked at the convenience store robbed by Thomas in 1993. The clerk testified that Thomas confronted him in the back of the convenience store and said, "This is a robbery, you're being robbed, don't come out front. If you come out front I'm going to kill you."
Thomas called Dr. James D. Larson, an expert in the field of psychology. Dr. Larson administered the Wechsler Adult Intelligence Scale revised intelligence test and determined that Thomas had a verbal IQ of 62, a performance IQ of 64, and a full-scale IQ of 61, which he testified falls into the mild range of mental retardation. Dr. Larson also testified that Thomas had been placed in special education classes and had occupational impairments and speech problems. Dr. Larson felt that Thomas had suffered from an extreme emotional disturbance on the night of Howard's murder. Dr. Larson also testified that while Thomas could appreciate the criminality of his conduct, Thomas's ability to conform his conduct to the requirements of the law was substantially impaired due to Thomas's lack of intellect and his substance abuse.[4] Thomas also called character witnesses.
The jury recommended death by a vote of ten to two, and the trial court followed the jury's recommendation after weighing four aggravating factors,[5] one statutory mitigating factor,[6] and nine nonstatutory mitigating factors.[7] In this Court, Thomas appeals his convictions and death sentence and raises seven claims.[8]

GUILT PHASE
Although not challenged by Thomas, this Court has reviewed the evidence to determine whether there was sufficient evidence to support the first-degree murder *132 conviction. See Mansfield v. State, 758 So.2d 636, 649 (Fla.2000). Upon review of the record, we find that there is competent, substantial evidence to support the first-degree murder conviction. Thomas confessed to killing Howard, and eyewitness testimony showed that Thomas was arguing with Howard prior to her death. Additionally, there is evidence which conflicts with Thomas's claim that he simply reacted to Howard's striking him in the head with the scaffolding brace. Dr. Berkland testified that Howard had injuries consistent with strangulation and punches to the head. There is also the presence of Howard's blood on her socks and on the beach towel, which is consistent with Thomas battering Howard prior to the confrontation at the Louise Drive scene, where the murder occurred.
Thomas's first claim is that the trial court committed reversible error by denying his motion for judgment of acquittal for the sexual battery charge. Section 794.011(3), Florida Statutes (1997), provides in pertinent part:
A person who commits sexual battery upon a person 12 years of age or older, without that person's consent, and in the process thereof uses or threatens to use a deadly weapon or uses actual physical force likely to cause serious personal injury commits a life felony. . . .
Sexual battery is defined as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another." § 794.011(1)(h), Fla. Stat. Consent is defined as "intelligent, knowing, and voluntary consent and does not include coerced submission. `Consent' shall not be deemed or construed to mean the failure by the alleged victim to offer physical resistance to the offender." § 794.011(1)(a), Fla. Stat. The State's evidence regarding the sexual battery charge was circumstantial in that there was no eyewitness testimony regarding the sexual act. Thomas does not dispute that the sexual act took place but, rather, asserts that the sexual act was consensual.
When the State relies on circumstantial evidence to prove a defendant's guilt for a crime, a motion for judgment of acquittal should be granted if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. See Orme v. State, 677 So.2d 258, 261-62 (Fla.1996).
[The trial court's] view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events.
State v. Law, 559 So.2d 187, 189 (Fla.1989) (citations omitted) (quoting State v. Allen, 335 So.2d 823, 826 (Fla.1976)). Thus, the trial court's function regarding the motion for judgment of acquittal as to sexual battery was to determine whether there was a sufficient inconsistency between the evidence presented by the State and Thomas's claims of innocence. See Orme, 677 So.2d at 262. If the evidence, viewed most favorably to the State, created an inconsistency with Thomas's theory, the trial court was to deny the motion and allow the finder of fact to resolve the inconsistency. See Woods v. State, 733 So.2d 980, 985 (Fla.1999). A trial court's denial of a motion for judgment of acquittal will not be reversed if there is competent, substantial evidence to support the jury's verdict. See id.
Thomas contends that the circumstantial evidence is not inconsistent with the hypothesis that the intercourse was consensual. Thomas points to the fact that there was no trauma to Howard's genitals and that the blood on Howard's socks was *133 caused by Howard's nose bleed. Thomas also points to the testimony of his witnesses that he and Howard were seen hugging and kissing in the store parking lot and that Thomas's aunt had given him condoms while Howard was with him.
The State presented the eyewitness testimony of the store clerk, who testified that Thomas and Howard were arguing before they left the store and that Thomas snatched Howard's keys and pushed her into her vehicle. The State also introduced a beach towel with a significant amount of Howard's blood on it that was found at the hospital scene, which is the location at which Thomas asserts he and Howard had consensual sex inside of Howard's vehicle. The State presented expert testimony that the seeds and vegetation found under Howard's jeans near her pubic area were consistent with her having been undressed outside of the vehicle. This evidence is inconsistent with Thomas's statement that he had consensual intercourse with Howard in the passenger seat of her vehicle. The State also presented expert testimony stating that the soil and blood stains on the bottoms of Howard's socks were consistent with Howard walking in blood. The State presented photographs of the bloody socks. The State further elicited testimony that Howard's nose bleeds had never been significant enough to account for the blood on Howard's socks. This evidence is inconsistent with Thomas's assertion that Howard had a nose bleed during sexual intercourse and that she used her socks to wipe off the blood. We conclude that the evidence presented by the State was sufficient to have the conflict between this evidence and Thomas's claims of innocence resolved by the jury.
This conclusion is supported by this Court's decision in Zack v. State, 753 So.2d 9, 26 (Fla.2000) (affirming defendant's convictions of first-degree murder, sexual battery, and robbery). In Zack, the defendant and the victim left a bar together and traveled to the victim's house, where the defendant sexually battered the victim before killing her. Similar to the claim of Thomas, the defendant's hypothesis of innocence for the sexual battery charge in Zack was that he had consensual sex with the victim prior to killing her. See id. at 18. The defendant claimed that after he and the victim had consensual sex in the victim's home, the victim made a comment that enraged the defendant, causing him to attack her. There was no direct evidence regarding whether the victim consented to the sexual intercourse. The State presented expert testimony that blood evidence and other physical evidence indicated that the assault began as soon as the defendant and the victim entered the victim's home. This Court affirmed the trial court's denial of the defendant's motion for judgment of acquittal and held that "the State presented evidence from which a reasonable jury could conclude that [the defendant] attacked the victim as soon as they entered her house and sexually assaulted her while she was in a weakened condition." Id. In the instant case, the State presented competent, substantial evidence from which a reasonable jury could conclude that Howard did not consent to sexual intercourse with Thomas and that Thomas sexually battered Howard.
Thomas's second claim is that the trial court committed reversible error by denying his motion for judgment of acquittal for the kidnapping charge. Section 787.01(1)(a), Florida Statutes (1997), states in pertinent part that:
The term "kidnapping" means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:

*134 . . . .
2. Commit or facilitate commission of any felony [or]
3. Inflict bodily harm upon or to terrorize the victim or another person.
Regarding the kidnapping charge, the State's evidence was a combination of direct evidence through the store clerk's testimony and Thomas's admissions in his recorded statement, and circumstantial evidence.
The store clerk testified that she witnessed Thomas arguing with Howard, snatching her keys away from Howard, pushing Howard into the passenger side of her vehicle, and repeatedly closing the passenger side door several times after Howard attempted to get out. Thomas admitted in his recorded statement that he snatched Howard's keys from her and that he forced her into her car. Thus, the State presented prima facie evidence that Thomas confined or abducted Howard in the store parking lot.
Regarding the intent element of kidnapping, the State presented circumstantial evidence that thereafter Thomas continued to confine Howard with the intent to inflict bodily harm upon or terrorize her. Evidence presented revealed that Thomas drove Howard from the store parking lot to the isolated locations where she was sexually assaulted and eventually murdered. Thomas admitted that he slapped Howard at the Louise Drive scene while she was in or near the vehicle. Thus, the State presented prima facie evidence that Thomas confined Howard with the intent to either commit a felony or inflict bodily harm upon or to terrorize her.
After determining that a prima facie case was established against Thomas for the kidnapping charge, the trial court's function regarding the motion for judgment of acquittal as to the intent element of kidnapping was to determine whether there was sufficient inconsistency between the evidence presented by the State and Thomas's claims of innocence. See Orme, 677 So.2d at 262. Thomas's claim of innocence is that although he eventually killed Howard at the Louise Drive scene, Howard left the convenience store parking lot with him voluntarily and his intent was only to confront Howard about why she had set him up for the theft of his vehicle. However, the competent and substantial evidence presented by the State suggests otherwise.
Thomas claims that he did not intend to harm Howard and that no violence occurred until the confrontation at the Louise Drive scene, which resulted in Thomas murdering Howard. Inconsistent with this claim, however, is that a significant amount of Howard's blood was found on the beach towel located at the hospital scene, which is more than three miles away from the Louise Drive scene. An expert also testified that Howard received several blows to the side of her head and possibly to her face that were inconsistent with blows from the murder weapon and consistent with punches. Additional evidence presented that is inconsistent with Thomas's hypothesis includes expert testimony that Howard had injuries consistent with manual strangulation and that Howard's blood located on the upper area of her jeans was consistent with Howard dropping blood while in a seated position. Viewed in a light most favorable to the State, this evidence established numerous inconsistencies with Thomas's hypothesis of innocence, and we conclude that the conflicting evidence presented an issue of fact that was properly submitted to the jury. See Gore v. State, 599 So.2d 978, 985 (Fla.1992) (rejecting claim that trial court erred in denying motion for acquittal where conflicting evidence presented a factual question for the jury). Thus, we hold *135 that the trial court did not err by denying Thomas's motion for judgment of acquittal for the kidnapping charge.
Thomas's final guilt phase argument is that the trial court committed reversible error by denying Thomas's motion to suppress Thomas's statements to police. A pretrial hearing was held on March 17, 1999, regarding Thomas's motion to suppress his statements to the police. The motion alleged that Thomas's IQ is so low that he lacks the mental ability to comprehend his Miranda rights. Officers Worley, Haley, and Whatmough testified at the hearing regarding Thomas's acknowledgment and waiver of his Miranda rights. Worley acknowledged that Thomas had a stuttering problem and that Worley had previously described Thomas as "a little slow." Worley also testified that he knew Thomas prior to the Howard investigation and had previously arrested him in 1993 for the robbery of a convenience store. During that arrest, Worley read Thomas his Miranda rights, and Thomas signed an acknowledgment that he understood his rights. Thomas subsequently signed a waiver form and admitted his participation in the robbery.[9]
Thomas called Dr. Larson, who testified concerning Thomas's mental impairments. Prior to the hearing, Dr. Larson reviewed Thomas's psychological records dating back to 1991, which concluded that Thomas had a full-scale IQ of 65 and that he suffered from an "unspecified mental retardation." Dr. Larson conducted his own testing and found that Thomas had a full-scale IQ of 61, which Dr. Larson stated falls into the mild range of mental retardation. His testing for academic achievement resulted in standard achievement scores between 49 and 65, which were considerably lower than expected for a person of Thomas's age. Dr. Larson testified that those achievement scores were, however, consistent with an individual whose intellectual functioning is within the mild range of retardation.
Dr. Larson administered the Instruments for Assessing, Understanding, and Appreciation of Miranda Rights test. He administered this test one week before the suppression hearing and found that Thomas could basically understand the concepts of Miranda warnings but noted that the time Thomas had spent with his attorneys and within the judicial process may have diminished the reliability of those results. Dr. Larson further commented that Thomas's familiarity with Worley could have potentially influenced Thomas to signal understanding when his actual understanding was limited. Dr. Larson, however, refused to state that Thomas did not understand the rights as advised to him by Worley. He also stated that a person of Thomas's intellectual capacity could comprehend Miranda rights if the rights were carefully explained over a period of time. The trial court denied Thomas's motion to suppress statements made to police officers, stating:
Dr. Larson's testimony would indicate to the Court that while [Thomas] might have had some problems in understanding the technical nature of Miranda warnings, that he comprehended the basic principles.... The Court finds that Dr. Larson never did say and was obviously given the opportunity to say so, but never did say that [Thomas] lacked the mental capacity to knowingly and intelligently understand his Miranda rights. So for the purpose of the record, the Court has reviewed the motion to suppress, along with the testimony and evidence presented in this case today, and based upon that review, the Court is going to deny the motion to *136 suppress. The Court finds that in considering the totality of the evidence in this case, the Court is confident that [Thomas] was properly advised of his Miranda rights prior to making the statements which were the subject of this motion, and that he freely and voluntarily and with sufficient understanding of his Miranda rights, gave these statements to the investigating officers. The Court further finds that there is no evidence before the Court of any misleading behavior or intimidating behavior on behalf of the police officers. The Court finds that the only obstacle to admission of these statements, the only possible obstacle, is strictly the defendant's IQ. I have spoken on that issue.
The present standard for reviewing suppression rulings was set forth in Connor v. State, 803 So.2d 598 (Fla.2001), when this Court stated:
[A]ppellate courts should . . . accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution. . . .
[Applying this standard] would still give a strong presumption of correctness to the trial court's determinations of historical fact, reversing those only if not supported by competent substantial evidence in the record. However, in determining whether the defendant was "in custody" at the time he consented to allowing the police to search, we have the responsibility of making an independent determination and review the application of law to those facts de novo.
Id. at 608. Applying the Connor two-step approach, we find that (1) competent, substantial evidence supports the trial court's findings of historical fact; and (2) the trial court reached the correct legal conclusion that Thomas knowingly, intelligently, and voluntarily waived his Miranda rights. See Connor, 803 So.2d at 608.
This Court addressed a similar situation in Kight v. State, 512 So.2d 922, 926 (Fla.1987), receded from on other grounds, Davis v. State, 698 So.2d 1182 (Fla.1997). In Kight, this Court held that expert testimony that the defendant's IQ was 69 did not preclude a finding that the defendant intelligently waived his Miranda rights. See id. The defendant had affirmatively acknowledged comprehension of his rights, and the totality of the circumstances evidenced that the defendant was fully aware of the nature and consequences of abandonment. See id.
In the instant case, Thomas acknowledged on several occasions that he understood his Miranda rights and the consequences of abandoning them. He also signed a written waiver asserting his understanding. Although a written statement is neither necessary nor by itself sufficient to establish waiver, it is strong proof that a waiver is valid. See North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Thomas never indicated to investigating officers that he did not understand any aspect of his rights. The police officers did believe that Thomas was slow, but the officers undertook precautions so that Thomas was informed, including reading Thomas his rights using simple language, giving Thomas a form to read, and repeatedly asking Thomas if he understood his rights. There is no evidence that officers unduly influenced or coerced Thomas or that they promised anything in exchange for his confession. Thomas's taped confession demonstrates *137 that Thomas "is able to plan, think rationally, and relate relevant facts in good detail when necessary." Padmore v. State, 743 So.2d 1203, 1206 (finding juvenile defendant voluntarily waived Miranda rights despite limited IQ).
Accordingly, we affirm Thomas's convictions.

PENALTY PHASE
We do not reach the penalty phase issues.[10] While this appeal has been pending, the Supreme Court has held that executing a mentally retarded offender is in violation of the United States Constitution. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In response to Atkins, this Court adopted Florida Rule of Criminal Procedure 3.203, which became effective on October 1, 2004. We consider Thomas's mental retardation claim made in this appeal to be an invocation of rule 3.203(d)(4)(E).[11] We therefore relinquish jurisdiction of this case to the circuit court for a determination of mental retardation pursuant to rule 3.203. Within thirty days of the entry of the circuit court's written order on the determination of mental retardation, the circuit court shall return the case to this Court for further proceedings as may be directed by this Court.

CONCLUSION
Accordingly, we affirm Thomas's convictions. We relinquish Thomas's claim of mental retardation to the circuit court for consideration in accord with rule 3.203.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] State witness Albert Ridge, a sheriff's deputy, testified at trial that Thomas told Ridge that he had left his vehicle running while he was inside the convenience store and that someone stole the vehicle. Ridge did not notice any injuries to Thomas.
[3] Investigators did not find a condom or condom wrapper at the hospital scene.
[4] Thomas told Dr. Larson that on the night of Howard's death, Thomas drank a fifth and a half of gin, smoked marijuana, and ingested cocaine.
[5] The aggravating factors were: (1) Thomas was serving a sentence of felony probation at the time of the murder; (2) Thomas had been previously convicted of a felony involving the use or threat of violence to the person (robbery without a weapon); (3) the capital felony was committed while Thomas was engaged in the commission of a kidnapping; and (4) the capital felony was especially heinous, atrocious, or cruel (HAC).
[6] The capital felony was committed while Thomas was under extreme mental or emotional disturbance (great weight).
[7] The nonstatutory mitigating factors were that Thomas (1) is mentally retarded with an IQ of 61 (significant weight); (2) had no relationship with his mother (slight weight); (3) obtained a certificate or diploma from high school, had good attendance, and did not present a disciplinary problem (no weight); (4) was a good worker (no weight); (5) was a model prisoner (moderate weight); (6) cooperated with law enforcement (slight weight); (7) never fled to evade arrest (no weight); (8) lacked an organized plan to kill (substantial weight); and (9) was a good child (some weight).
[8] Thomas claims that the trial court committed reversible error by (1) denying Thomas's motion for judgment of acquittal for the sexual battery charge; (2) denying Thomas's motion for judgment of acquittal for the kidnapping charge; (3) sentencing Thomas to death despite evidence that Thomas was mentally retarded; (4) denying Thomas's motion to suppress Thomas's statements to police; (5) refusing to give weight to mitigation presented by Thomas; (6) refusing to find the statutory mitigator of substantial impairment of capacity to appreciate criminality or to conform conduct to the requirements of the law; and (7) imposing a death sentence that is not proportionate.
[9] Thomas was adjudicated guilty of robbery with no weapon.
[10] These issues are: (1) sentencing Thomas to death despite evidence that Thomas was mentally retarded; (2) refusing to give weight to mitigation presented by Thomas; (3) refusing to find the statutory mitigator of substantial impairment of capacity to appreciate criminality or to conform conduct to the requirements of the law; and (4) imposing a death sentence that is not proportionate.
[11] Florida Rule of Criminal Procedure 3.203(d)(4)(E) states:

If a death sentenced prisoner has filed a motion for postconviction relief and that motion has been ruled on by the circuit court and an appeal is pending on or before October 1, 2004, the prisoner may file a motion in the supreme court to relinquish jurisdiction to the circuit court for a determination of mental retardation within 60 days from October 1, 2004. The motion to relinquish jurisdiction shall contain a copy of the motion to establish mental retardation as a bar to execution, which shall be raised as a successive rule 3.851 motion, and shall contain a certificate by appellate counsel that the motion is made in good faith and on reasonable grounds to believe that the defendant is mentally retarded.
Amendments to Fla. Rules of Crim. Pro., 875 So.2d 563, 571 (Fla.2004).